*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* S. L. KORDUPEL, Minor.

UNPUBLISHED
September 29, 2022

No. 359419
Livingston Circuit Court
Family Division
LC No. 19-015924-NA

Before: K. F. KELLY, P.J., and LETICA and RICK, JJ.

PER CURIAM.

Respondent, the mother of the minor child, SK, appeals by right the trial court's order terminating her parental rights to SK. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case was previously before us when respondent appealed, and we affirmed, the trial court's order of adjudication and initial dispositional order placing SK with petitioner RB under a fictive kin order. *In re Kordupel*, unpublished per curiam opinion of the Court of Appeals, issued May 28, 2020 (Docket No. 350559). The facts through adjudication are thoroughly set forth in that opinion.

After the trial court concluded it was proper to exercise jurisdiction over SK, the Department of Health and Human Services (DHHS) was ordered to open a case and assign a foster care worker. Respondent's parenting time was suspended because of allegations of sexual abuse and because RB sought termination of respondent's parental rights at disposition. DHHS was ordered to prepare a parent-agency treatment plan (PATP). Respondent's parenting time was suspended until SK's therapist could provide a written recommendation as to whether parenting time was in SK's best interest.

Respondent's PATP included a psychological evaluation, counseling to address emotional stability, parenting classes, a sex offender risk assessment, substance abuse treatment, random drug testing, participation in SK's counseling sessions when appropriate, housing, employment, and domestic violence counseling. DHHS reports generally indicated that respondent complied with her PATP throughout the case. The primary barriers to reunification were the lack of a bond between SK and respondent, respondent's inability to obtain and maintain employment, and her

-1-

lack of empathy and accountability for SK's trauma. Respondent relied solely on state assistance for income to support herself and her four children, and she relied on a grant from the Detroit Housing Commission to pay the rent for her Section 8 housing. While respondent acknowledged that she was responsible for the court's taking jurisdiction over SK, she blamed RB for the trauma that SK was experiencing throughout the present case. She was appropriate during parenting time, but was unable to respond appropriately to SK's expression that she wanted to live with RB and did not want to live with respondent, instead asking SK who was "feeding her lies."

In November 2019, SK began individual therapy with Michelle Sunny at ACS Counseling Services (ACS). Sunny was not a certified trauma specialist but worked with trauma victims using cognitive behavioral therapy. The goal of SK's therapy was to build a bond between SK and respondent so that reunification could take place. Sunny diagnosed SK with adjustment disorder and anxiety. At the same time, respondent was referred for individual counseling with Diane Spink at ACS. The two therapists were to work together to provide the court with a recommendation regarding parenting time. Sunny and SK's guardian ad litem (GAL) recommended that no parenting time take place until the results of SK's trauma assessment were received, given the substantial trauma in SK's history or, alternatively, that therapeutic parenting time take place. Consequently, no parenting time occurred between February 2019 and February 2020.

The trauma assessment report was finalized on February 4, 2020. The trauma assessment indicated that SK's bond with respondent was insecure and that she had disorganized attachment. The assessment recommended that respondent's parenting time visits be supervised. The assessment also stated that SK and respondent "may benefit from visits that are facilitated by an independent, third party, therapist, who is familiar with attachment and trauma." The assessment noted SK's diagnosis of post-traumatic stress disorder as well as SK's fear of being left alone, and recommended that SK be enrolled in trauma-focused cognitive behavioral therapy (TF-CBT) with a trained clinician so that "she may process her traumatic experiences with the help of a specialist." The assessment stated that SK needed permanency as quickly as possible to minimize further damage to SK's mental health and emotional well-being.

Respondent had in-person parenting time visits on February 28 and March 5, 2020, before the COVID-19 restrictions were put in place. The visits were traumatizing for SK and triggered her fear of abandonment, of being left alone by respondent, and of being spanked while in respondent's care. SK expressed that she did not want to visit or live with respondent and that she wanted to live with RB. Sunny observed a decline in SK's behavior after the visits, including nightmares, outbursts, defiance, and confusion. Sunny believed that any parenting time would be harmful to SK and did not believe that it was possible in this case to reestablish a bond through therapeutic parenting time. The GAL also opposed parenting time. The court ordered that parenting time be supervised by a neutral independent third-party therapist familiar with attachment and trauma. DHHS was unable during the COVID-19 pandemic to find an independent third-party therapist to supervise parenting time, but Sunny and Spink agreed to work together to supervise parenting time until DHHS could find another therapist.

In-person parenting time resumed on June 22, 2020, and by October 21, 2020, the GAL moved to suspend respondent's parenting time with SK. The GAL believed the onset of parenting time was causing SK extreme stress, anxiety, and additional trauma that was manifesting in a variety of ways, including nightmares about being taken or left alone, as well as involuntary jerking

of her head, body, arms, and legs. The court declined to suspend parenting time but required parenting time to be supervised by a therapist familiar with trauma or by DHHS. In November 2020, the court ordered parenting time to be increased to twice weekly, still to be supervised, and ordered that SK and respondent be referred for family therapy.

The family therapist, Megan Vaccaro, began working with SK in December 2020. She believed that SK lacked trust in respondent and that SK was strongly bonded to her foster family. Vaccaro, as well as Sunny, the GAL, and SK's court-appointed special advocate (CASA), observed that SK had no bond or attachment with respondent. Jennifer Campau, a TF-CBT therapist who began working with SK in December 2020, observed that SK's anxious and aggressive behaviors increased both in and outside of sessions and her tics increased in frequency and severity. SK expressed to Campau her fear of being taken away from RB and expressed that she did not want to live with respondent. As sessions progressed, SK verbalized more thoughts of self-harm. She became increasingly angry and avoided participation in sessions. According to Campau, SK regressed in her behaviors, and therapy was unable to provide any progress toward reunification.

In May 2021, RB, joined by the Livingston County prosecutor, filed an amended supplemental petition for termination of respondent's parental rights.[1] Following a lengthy termination hearing, the trial court issued its written findings of fact and conclusions of law. The court found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(g) (parent is unable to provide proper care and custody) and (j) (reasonable likelihood that the child will be harmed if returned to parent's home). The court also found that termination was in SK's best interest. This appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews for clear error the trial court's determination that reasonable efforts were made.[2] *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018). We also review for clear error the trial court's determination that statutory grounds for termination were proven by clear and convincing evidence and that termination is in the child's best interest. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A finding is clearly erroneous if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Gonzales/Martinez*, 310 Mich App 426, 430-431; 871 NW2d 868 (2015) (quotation marks and citation omitted). Once a trial court has concluded that the petitioner has established a statutory ground for termination by clear and convincing evidence, it then must

---

[1] RB had filed a supplemental petition for termination of parental rights in December 2020, but the court did not authorize the filing of the petition.

[2] Because respondent did not raise the issue of reasonable efforts before the termination hearing, the trial court's findings regarding reasonable efforts are reviewed for plain error affecting substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). To establish plain error, a party must show that an error occurred, the error was clear or obvious, and the error affected the party's substantial rights. *Id*.

determine, by a preponderance of the evidence, whether termination is in the best interest of the minor children. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

## III. DISCUSSION

## A. REASONABLE EFFORTS

Respondent first argues that the trial court erred when it terminated her parental rights because it incorrectly determined that reasonable efforts were provided to reunite her with SK. We disagree.

Before a court may terminate an individual's parental rights, the petitioner must make reasonable efforts to reunite the family. *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2). "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). While the petitioner has a responsibility to expend reasonable efforts to provide services to secure reunification, the respondent also has "a commensurate responsibility . . . to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). A respondent has the responsibility to not only cooperate and participate in the services but also to benefit from them. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). And to prevail on a claim that the petitioner's reunification efforts were inadequate, a respondent must demonstrate that she would have fared better if sufficient services were offered. *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005).

The trial court found that DHHS made reasonable efforts for reunification by providing respondent with "numerous services to address her barriers to safe parenting," which included "psychological evaluation, substance abuse assessment, substance abuse treatment, random alcohol and drug testing, co-occurring counseling, medical, dental, and mental health services, Family Team Meetings, Michigan Automated Prescription System, home visits, parenting class, sex offender risk assessment, Wraparound services, supervised parenting time visits, and family therapy." Respondent's parenting time was also increased, giving her "more opportunities to heal the parent-child bond with SK, and more opportunities to demonstrate her parenting skills." Yet, the trial court found that "[d]espite this plethora of services provided, none have been successful in making reunification possible."

Respondent does not dispute that DHHS provided the services identified by the trial court; however, respondent contends that DHHS failed to provide SK and respondent with visits facilitated by an independent, third-party therapist familiar with attachment and trauma.[3] Respondent also contends that DHHS delayed finding a TF-CBT therapist for SK as recommended by the trauma assessment. She argues that with these supports, she would have fared better in her efforts to reunite with SK.

---

[3] Contrary to respondent's suggestion, DHHS did not fail to provide parenting time. When the court gave DHHS discretion to allow supervised parenting time, DHHS did so.

SK's trauma assessment took place in December 2019 and the report was finalized in February 2020. Restrictions resulting from COVID-19 were initiated in March 2020, the same time period the trial court ordered that parenting time be supervised by a neutral independent therapist familiar with attachment and trauma. DHHS attempted to locate a therapist but was unsuccessful, because of both the lack of a qualified therapist in the area and the COVID-19 pandemic. In the meantime, DHHS arranged in April 2020 for SK's individual therapist and respondent's individual therapist to work together to jointly supervise parenting time until a therapist could be located. DHHS subsequently arranged for a trauma-certified therapist, Megan Vaccaro, to provide family therapy beginning in December 2020. At the same time, DHHS also referred SK and respondent to Jennifer Campau for TF-CBT therapy to repair the caregiver relationship and to address the effects of trauma. DHHS thus made reasonable efforts to provide therapy with the objectives of establishing a bond and attachment between SK and respondent and addressing SK's trauma. Under these circumstances, respondent has failed to show that the trial court plainly erred by finding that DHHS provided reasonable services to reunify respondent and SK.

## B. STATUTORY GROUNDS

Next, respondent contends the trial court erred by finding statutory grounds for termination under MCL 712A.19b(3)(g) because the evidence demonstrated that respondent was capable of providing proper care and custody. Respondent also argues the trial court erred by terminating respondent's parental rights under MCL 712A.19b(3)(j) because clear and convincing evidence did not exist to demonstrate that there was a reasonable likelihood of harm to SK on the basis of respondent's conduct and capacity as a parent. Again, we disagree.

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). However, "[a] parent's right to control the custody and care of her children is not absolute, as the state has a legitimate interest in protecting 'the moral, emotional, mental, and physical welfare of the minor' and in some circumstances 'neglectful parents may be separated from their children.' " *In re Sanders*, 495 Mich 394, 409-410; 852 NW2d 524 (2014), quoting *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972). With these principles in mind, this Court must examine the record to determine whether there was clear and convincing evidence presented in this matter sufficient to legally justify the termination of respondent's parental rights. *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 635; 853 NW2d 459 (2014). The trial court must find at least one of the statutory grounds in order to terminate parental rights. *Gonzales/Martinez*, 310 Mich App at 431.

Here, the trial court found that two statutory grounds existed: MCL 712A.19b(3)(g) and (j). Termination under MCL 712A.19b(3)(g) is proper if the trial court finds by clear and convincing evidence that "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." See also *Rood*, 483 Mich at 117. A "parent's *compliance* with the parent-agency agreement is evidence of her ability to provide proper care and custody." *In re JK*, 468 Mich 202, 214; 661 NW2d 216 (2003). Respondent correctly notes that DHHS reported that respondent

completed the tasks in her case service plan, did not support termination of respondent's parental rights, and recommended immediate reunification of SK with respondent. The Court recognized in *JK*, however, that in some cases, satisfaction by the parent of the parent-agency agreement would not render the parent "fit." *Id*. at 214 n 20.

Respondent argues that she complied with her PATP and made improvement in her case before the termination of her parental rights. The record supports the trial court's finding that respondent complied with several terms of her PATP. The record also supports the trial court's finding that respondent was able to support herself and her children on the income she received through state assistance. However, lack of employment and lack of appropriate housing can support termination under MCL 712A.19b(3)(g). See *Gonzales/Martinez*, 310 Mich App at 432-433. Throughout this case respondent failed to obtain and maintain employment as ordered by the court despite her ability to do so and had a lengthy history of inconsistent housing. Although respondent obtained Section 8 housing for her and her other four children during the proceedings, she jeopardized her housing situation by allowing the biological father of her new baby to reside most of the week at the home despite knowing that she was violating her housing contract by allowing him to reside in the home. Respondent's housing was, therefore, in jeopardy because she was violating her contract. Respondent acknowledged that her new baby's father was paying some of her bills and that she did not report this income. Testimony was presented that the failure to include all income when applying for Section 8 housing can be considered fraud and can result in the permanent loss of Section 8 housing. Under these circumstances, while respondent's housing itself was apparently appropriate, the housing situation was not stable. Given that respondent's lack of employment did not improve, and she allowed her housing situation to remain unstable by allowing another person to reside most nights at the home, her actions did not demonstrate that she could provide a stable home for SK.

Additionally, the risk that respondent would fail to provide proper care and custody was established by her lack of empathy and her lack of responsibility for SK's trauma. There was significant evidence of SK's traumatic state, as well as significant testimony that respondent was not emotionally connecting with SK. Interactions between SK and respondent were generally poor, and SK maintained that she did not want to visit with respondent or live with her. SK became frustrated, upset, and aggressive. SK also developed tics, self-harming thoughts, and nightmares. SK's therapist opined that contact with respondent was retraumatizing SK and causing her damage. For these reasons, the trial court did not clearly err by finding that termination was warranted under MCL 712A.19b(3)(g).

Because we conclude that at least one ground for termination existed, we need not consider the additional grounds upon which the trial court based its decision. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). Thus, we conclude the trial court did not err when it found there was statutory grounds for termination.

## C. BEST INTERESTS

Lastly, respondent argues the trial court erred when applying the best-interest factors. Specifically, respondent contends the trial court erred by (1) finding that there was no bond between SK and respondent or between SK and her siblings despite evidence to the contrary; (2)

improperly characterizing respondent's parenting ability; and (3) the court failed to address RB's harmful behaviors in its best-interest analysis. We disagree.

When deciding whether termination is in a child's best interest, a trial court weighs a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016) (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714. The court can also consider the factors provided in MCL 722.23, including the reasonable preference of the child, if the court considers the child to be of sufficient age to express preference. MCL 722.23(i).

After duly considering 19 proper factors, the trial court found that 18 of the factors supported termination. Respondent challenges the trial court's findings with respect to only three factors: SK's bond to respondent, SK's bond to her siblings, and respondent's parenting ability. After reviewing the record, we are not left with a definite and firm conviction that the trial court made a mistake regarding these three factors.

First, respondent does not discuss or challenge the trial court's factual findings that SK did not have a bond with respondent, nor does she address the extensive testimony regarding the lack of a bond between respondent and SK. Rather, respondent maintains that the court's findings ignore a few chosen instances of testimony that respondent has selected from the record. Respondent has failed to explain how a few isolated instances of positive parenting time demonstrate a bond between SK and respondent, particularly in light of the testimony of SK's service providers, the CASA, RB, and the GAL that no bond or attachment between SK and respondent was observed. The trial court did not clearly err by finding that SK did not have a bond with respondent.

Likewise, respondent does not discuss the trial court's findings regarding SK's bond with her siblings, nor does she address the testimony presented regarding the lack of a bond between respondent and her siblings. Instead, she relies on a sibling assessment that examined SK's interaction with her siblings on one occasion and a DHHS report stating that the siblings "appear to enjoy the time with one another, played together the entire visit and greeted one another with smiles." Despite these two moderately positive pieces of evidence, the balance of the evidence did not support a strong bond between SK and her siblings.

Michelle McCormack, a foster care worker, testified that she observed a parenting time visit on the day after the sibling assessment and that SK drew a picture of herself and her siblings and said, "I don't like you and I don't want to live with you." SK's CASA testified that SK never talked about her siblings. RB and her husband testified that SK did not talk about her siblings and never expressed a desire to see them. SK's therapist, Sunny, testified that SK told her that she hated going to sibling visits and did not like her siblings. After review of the sibling bonding assessment, Sunny believed that siblings visits were harmful to SK. Thus, the trial court did not err by finding that SK did not have a bond with her siblings.

Lastly, respondent argues that the trial court "improperly characterized respondent's parenting ability" by finding only "some evidence" that respondent's parenting ability had improved since adjudication. She contends that the court failed to acknowledge that "a multitude of service providers" attested to her "progress and capabilities," that DHHS reports found her in compliance with her case service plan, and that she was engaged in individual and family therapy and had completed a parenting class.

The trial court did acknowledge that respondent completed a parenting class. The court also found, in addressing respondent's compliance with her PATP, that respondent testified she completed her psychological evaluation and was following the recommendations, she completed the substance abuse assessment and the sex offender risk assessment, she continued to participate in Wraparound services and individual counseling, and she attended all of her parenting time. The court also found, however, that on August 2, 2021, respondent failed to appear for family therapy, believing it was canceled because of the parties' hearing date that day, and that on August 9, 2021, respondent contacted the family therapist, Vaccaro, and unilaterally canceled all future family therapy sessions. The court found that respondent had "shown incremental progress in completing her services."

Contrary to respondent's assertions, the trial court acknowledged respondent's efforts and progress. Consequently, respondent's contention that the trial court's failure to "acknowledge any of these factors resulted in a deeply flawed analysis of [respondent's] parenting ability" is incorrect. Respondent has made no other challenge to the trial court's findings regarding respondent's parenting ability. The trial court did not clearly err by finding that respondent's parenting ability weighed in favor of termination.

In sum, the trial court did not clearly err by finding by a preponderance of the evidence that termination of respondent's parental rights was in SK's best interest. SK was *eight years old* at the time of termination. She spent all but 15 months of her life in foster care, all in the home of fictive kin, RB. SK's individual therapist, her CASA, the GAL, and the family therapist testified that a strong bond existed between SK and RB and that no bond existed between SK and respondent. SK began having nightmares, tics, aggression, regression of behaviors, and thoughts of self-harm when parenting time began, and her behaviors worsened when parenting time was increased. SK continually expressed that she did not want to visit or live with respondent and that she wanted to live with RB. SK identified RB and her family as her own family. SK's trauma assessment indicated that SK needed permanence and stability. RB testified that she wished to adopt SK. Considering these circumstances, the trial court did not clearly err when it found that termination of respondent's parental rights was in SK's best interest.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Anica Letica
/s/ Michelle M. Rick

-8-